| | | |
|---|---|---|
| BARRY ROWLAND and DONNA ROWLAND, | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GLOBAL FINANCIAL PRIVATE CAPITAL, LLC, GF INVESTMENT SERVICES, LLC, MINNESOTA LIFE INSURANCE COMPANY, SANDY MORRIS FINANCIAL & ESTATE PLANNING SERVICES, LLC, and SANDEVA O'BRYAN MORRIS, | ) ) ) ) ) ) ) ) | **COMPLAINT** **(Jury Trial Demanded)** |
| Defendants. | ) ) ) | |
| _____ | ) | |

Plaintiffs Barry Rowland ("Mr. Rowland") and Donna Rowland ("Mrs. Rowland") (collectively, the "Rowlands" or "Plaintiffs"), complaining of Defendants Global Financial Private Capital, LLC, GF Investment Services, LLC, (collectively, in the singular form, "Global Financial"), Minnesota Life Insurance Company ("Minnesota Life"), Sandy Morris Financial & Estate Planning Services, LLC ("Morris FES"), and Sandeva O'Bryan Morris ("Morris" or "Sandy Morris") (collectively, "Defendants"), allege and say as follows:

## NATURE OF THIS ACTION

1.      Plaintiffs seek to recover damages arising from Mr. Rowland's purchase of an Omega Builder Indexed Universal Life Insurance Policy (the "Omega IUL Policy"), under the advice of, and through material misrepresentations and omissions of material fact by, their trusted investment advisor and fiduciary, Sandy Morris. Upon information and belief, at all times alleged

{00450743.DOC}

herein, Morris was operating in the course and scope of an agency relationship with defendants Minnesota Life, Global Financial and Morris FES.

2. At all times relevant, Mr. Rowland held a Bachelor of Science degree in Agronomy (soil management and crop production) and had spent his career in Construction Management. Mrs. Rowland was, at all times relevant, a registered nurse. The Rowlands lacked a fundamental understanding of the complexities and tax implications associated with the subject life insurance policy.

3. Acting in her own self-interest, in order to maximize her commissions, Morris, convinced the Rowlands, through material nondisclosures and misleading statements, to pursue a stream of "tax free income" during retirement by taking unqualified distributions from qualified retirement accounts to fund premiums on the extremely expensive, unnecessary, and unsuitable Omega IUL Policy, which was projected to cost $684,000.

4. Unbeknownst to Plaintiffs, each annual premium payment on the Omega IUL Policy, triggered *immediate* federal and state income tax liability of $88,350 and $69,253.29, respectively, which Plaintiffs lacked the income and liquid assets to pay without taking additional unqualified distributions from Mr. Rowland's qualified retirement accounts and incurring greater tax liability. Due to Plaintiffs' inability to afford the tax payments triggered by the purchase of the Omega IUL Policy, the IRS currently has a lien against their home for an amount in excess of $125,000 and they have incurred substantial other damages.

5. In their Complaint, Plaintiffs allege claims for breaches of fiduciary duty, common law fraud, constructive fraud, violation of the North Carolina Investment Advisors Act, breach of contract, unfair and deceptive trade practices, and alternative claims for negligent selection and

{00450743.DOC}

retention of an independent contractor. Plaintiffs also seek declaratory relief, declaring that certain documents executed by Mr. Rowland in order to purchase the Omega IUL Policy were procured by fraud and/or constructive fraud, are illegal under the positive law of this State, and that such documents, including the Omega IUL Policy, are therefore null and void.

## PARTIES

6.    Mr. Rowland is a citizen and resident of Catawba County, North Carolina.

7.    Mrs. Rowland is a citizen and resident of Catawba County, North Carolina.

8.    Upon information and belief, Sandy Morris is a citizen and resident of Hillsborough County, Florida.

9.    Upon information and belief, Sandy Morris Financial and Estate Planning Services, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Tampa, Florida.

10.    Upon information and belief, Minnesota Life Insurance Company is an insurance company organized and existing under the laws of the State of Minnesota, with its principal place of business in St. Paul Minnesota.

11.    Upon information and belief, Global Financial Private Capital, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Sarasota, Florida.

12.    Upon information and belief, GF Investment Services, LLC is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Sarasota, Florida.

{00450743.DOC}

13.     Global Financial Private Capital, LLC, and its affiliate, GF Investment Services, LLC are collectively referred to herein as "Global Financial." Upon information and belief, Global Financial holds itself out as being "[a] leading provider of comprehensive, fully integrated wealth management services for institutional and individual investors."

14.     All allegations set forth herein as to the acts or omissions of Defendants refer to the acts and omissions of employees and/or agents of Defendants acting within the course and scope of their employment and for whose acts and omissions Defendants are liable.

## JURISDICTION, VENUE AND CONDITIONS PRECEDENT

15.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 in that there is complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeds seventy-five thousand dollars ($75,000).

16.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the events establishing Plaintiff's claims occurred in this judicial district.

17.     All conditions precedent to the filing of this action have been performed or have occurred.

## FACTUAL BACKGROUND

18.     In or around the summer of 2014, Mr. Rowland met Morris while attending Morris' free social security seminar that had been advertised on the radio.

19.     To the best of Mr. Rowland's recollection, soon after the free seminar, in July of 2014, Mr. Rowland received marketing materials from Morris and Morris FES representing, among other things, that Morris FES was a "full-service financial advisory firm dedicated to

{00450743.DOC}

cutting-edge strategies and practical core values in an effort to provide valued clientele with sound financial strategies for retirement."

20.     Morris and Morris FES further represented that the financial services offered to clients combined "income planning, institutional wealth management and estate planning services" in order to  provide "the highest quality advise and wealth management solutions to simplify and enhance the quality of [a client's] life".

21.     The marketing materials further represented that Morris and Morris FES offered private asset management, asset protection, *income tax minimization*, and risk management services.

22.     Morris and Morris FES represented in the marketing materials that all financial advisory services were provided through Global Financial Private Capital, LLC, which was a registered investment advisor with the SEC. The marketing materials further stated that "Sandy [Morris] maintains the Series 65 Investment Advisor Representative license which has a *Fiduciary responsibility* to her clients." (emphasis supplied).

23.     Relying on the representations in the marketing materials and Morris' and Morris FES' affiliation with Global Financial, the Rowlands trusted Morris, Morris FES, and Global Financial to assist them in making sound, suitable investment decisions, which were consistent with their fiduciary obligations to them.[1]

---

[1]The Rowlands also received a document indicating that, at all times relevant, Morris was also registered with "Global Financial Investment Services, LLC." However, undersigned counsel has not been able to identify an entity that exists with that name.

24. At the time that the Rowlands first retained the financial advisory services of Morris, Morris FES, and Global Financial, Mr. Rowland earned $156,000 per year, and Mrs. Rowland earned $30,000 per year. The couples' collective net worth was approximately $2,105,000 with most of their savings consisting of Mr. Rowland's employer's stock, which was held inside of a 401k retirement account.

25. Mr. Rowland advised Morris that he planned to retire in March of 2017, at the age of 67, and that his financial objectives included "growth potential" and "flexibility." He further explained that once he retired, he would not receive a pension and his only income would consist of federal social security and any dividends that he received from his 401k investments. The Rowlands also had a $390,000 outstanding mortgage on their home.

### The "Bait and Switch" Sale of the Omega IUL Policy

26. Over the course of time in which Morris provided wealth management services to the Rowlands, Morris would send Mr. Rowland written "income plans" containing Morris' "summary, analysis, and recommendations."

27. In or around February 16, 2016, Morris provided Mr. Rowland, who was then 65 years old, with a proposed income plan (the "Feb. 2016 Income Plan").

28. The Feb. 2016 Income Plan documented Morris' understanding that Mr. Rowland was earning $156,000 per year, with an expected bonus of $15,000, and that Mrs. Rowland only earned $30,000 per year.

29. The Feb. 2016 Income Plan further documented Morris' understanding that Mr. Rowland had a target retirement date of March 2017 and that he would not receive a pension once he retired.

{00450743.DOC}

30.    The Feb. 2016 Income Plan further reflected Morris' understanding that, upon Mr. Rowland's retirement, the Rowlands would continue to owe a monthly mortgage payment of $2,510.00 or $30,120.00 annually and that the Rowlands' youngest child, Laurel, was college-age. While not specifically reflected in the Feb. 2016 Income Plan, the Rowlands are informed and believe that Morris was aware that Laurel was in fact, enrolled in college, and the Rowlands were funding Laurel's college education and living expenses.

31.    The Feb. 2016 Income plan recommended that Mr. Rowland not file for social security benefits until the age of 70, at which point, Morris projected that Mr. Rowland would receive $34,140 per year in social security benefits.

32.    According to Morris' analysis as set forth in the Feb. 2016 Income Plan, even if Mr. Rowland drew $78,000 per year in dividends from his 401(k) plan and drew social security, the Rowlands would have an income gap of $41,000 per year.

33.    Morris recommended to the Rowlands, in the Feb. 2016 Income Plan, that Mr. Rowland invest $800,000 of his retirement savings in an "annuity" and transfer another $950,000 of his retirement savings to an investment account managed by Morris so that his investment portfolio could be reallocated.

34.    Morris represented to the Rowlands that, after the "re-design" of Mr. Rowland's retirement plan, Mr. Rowland was projected to receive $50,000 per year of "tax-free" income from the proposed "annuity" and $33,750 in income from the investment accounts managed by Morris, beginning when Mr. Rowland turned 67 years old.

35.    To the best of the Rowlands' recollections, at some date between February 16, 2016 and February 23, 2016, Morris, who was located in Florida, and the Rowlands who had moved to

North Carolina, had a teleconference meeting through Skype, to discuss the Feb. 2016 Income Plan and the details of the "annuity" investment that Morris was proposing.

36.     The key feature of the proposed "annuity" emphasized by Morris was the product's ability to pay $50,000 per year in tax-free income, beginning when Mr. Rowland turned 67 years old.

37.     During this Skype meeting, Morris falsely characterized and caused the Rowlands to believe that the Omega IUL Policy would function in a manner analogous to an "annuity." Morris, likewise, mislead the Rowlands to believe that after making three large premium payments for the product, the Omega Life Policy was *guaranteed* to provide a steady tax-free income stream of $50,000 per year throughout Mr. Rowland's retirement, through its "unique" loan feature.

38.     Relying on the expertise of Morris and trusting Morris, their fiduciary and financial advisor, to only select suitable investments for the Rowlands, the Rowlands agreed to purchase the Omega IUL Policy that Morris recommended.

39.     The Rowlands have since learned, and are now informed and believe, however, that in soliciting the purchase of the Omega IUL Policy, Morris, in breach of her fiduciary obligations to them, was placing her own financial interests in earning commissions on the sale of the Omega IUL Policy over the Rowlands' financial interests and needs for suitable retirement investments.

**Morris Completed Most of the Omega Application on Mr. Rowland's Behalf**

40.     Shortly after the teleconference with Morris, at a date on or prior to February 23, 2016, Morris, further soliciting the purchase of the Omega IUL Policy, sent Mr. Rowland, either via U.S. Mail or email, an application for the purchase of the Omega IUL Policy (the "Omega Application").

{00450743.DOC}

41.     To the best of Mr. Rowland's recollection, Mr. Rowland received and signed the Omega Application while present in the State of North Carolina, and while living at the Sherrills Ford, North Carolina address reflected on the Omega Application.

42.     The Omega Application was twenty-four (24) pages long. Twenty-three (23) of the twenty-four (24) page Omega Application had been completed by Morris prior to Mr. Rowland's receipt of the Omega Application package.

43.     Morris directed Mr. Rowland to personally complete only one section of the Omega Application package, concerning Mr. Rowland's annual income, assets, and liabilities, and to sign the signature and initial lines at each place that Morris had highlighted throughout the package.

44.     Mr. Rowland trusted that Morris, his fiduciary, had checked appropriate boxes and filled in accurate information throughout the Omega Application package. Mr. Rowland further relied on Morris' expertise in completing the application on his behalf.

45.     Mr. Rowland, is now informed and believes, however, that some of the information that Morris filled into the application was inaccurate, fraudulent, and inconsistent with the February 2016 Income Plan that the Rowlands and Morris had discussed during the Skype teleconference.

46.     Given the length of the Omega Application, the small font size, that most of the information in the Omega Application appeared to be correct, and because he placed a great deal of trust in Morris, Mr. Rowland did not review the Omega Application as closely as he would have had he answered the questions himself, and he, therefore, did not notice the inaccurate information that had been written into the application in certain places by Morris.

{00450743.DOC}

47.     Specifically, the Rowlands are now informed and believe, but did not realize at the time, that Morris checked a small box indicating that the purpose of the Omega IUL policy was "Estate planning," when in fact, the Rowlands and Morris had discussed that the primary purpose of purchasing the policy was to provide a stream of tax-free income during Mr. Rowland's retirement.

48.     In fact, at no point prior to February 23, 2016, had the Rowlands and Morris ever discussed the proposed death benefit on the policy, as estate planning was not a real priority to them.

49.     Likewise, the Rowlands are now informed and believe, but did not realize at the time, that Morris filled in a small box on the Omega Application, indicating that the premium amount to be invested in the Omega IUL policy was $1,028,400.00 spread over three payments. However, the Rowlands had only discussed and agreed to pay $800,000.00 as premiums for the Omega IUL policy.

50.     Likewise, the Rowlands are now informed and believe, but did not realize at the time, that Morris had checked small boxes on the Omega Application, indicating that Mr. Rowland had no other life insurance or annuities in force, when in fact, at all times relevant, Mr. Rowland did have annuities in force that Morris had previously sold to him.

51.     The Rowlands are now informed and believe, but did not realize at the time, that Morris checked a small box indicating that the "Source of Funds" for the annual premium payments was the "Sale of Investments" rather than "Retirement Funds (401k, IRA, Roth IRA, etc.)."

52.     However, at all times relevant, Morris, as the Rowlands' financial advisor, knew that Mr. Rowland did not have sufficient assets or income outside of his qualified retirement accounts (*i.e.* IRA accounts and 401k Plan) to fund the premium payments that would be due on the Omega IUL Policy.

53.     Likewise, contrary to the box checked by Morris, the written Feb. 2016 Income Plan documented, that, all times relevant, Morris not only knew that the source of fund for the purchase of the Omega IUL policy was retirement funds, but she had expressly advised Mr. Rowland to sell stock held inside of his employer's retirement (401k) plan to fund the Omega IUL Policy.

54.     The Rowlands are now further informed and believe, but did not realize at the time, that Morris checked a small box indicating that she had "explained to this customer that [she] represent[ed] Minnesota Life with respect to the sale and service of the product." However, this statement was false, as Morris had solicited the purchase of the Omega IUL Policy through the Feb. 2016 Income Plan, prepared by Morris in her capacity as the Rowlands' financial advisor and fiduciary.

55.     At all times relevant, the Rowlands were paying a separate fee for the purported advisory and wealth management services rendered by Morris, Morris-FES, and Global Financial.

56.     At no point prior to Mr. Rowland's purchase of the Omega IUL Policy did Morris explain that she was no longer acting in the Rowlands' best interests, as their financial advisor and fiduciary, but was rather acting in the interest of Minnesota Life, with respect to the sale and service of the Omega IUL Policy.

{00450743.DOC}

57. The Rowlands are further informed and believe, but did not realize at the time, that Morris checked a small box on the Omega Application indicating that she had met in person with Mr. Rowland to go over the Omega IUL Policy materials, when in fact, Mr. Rowland had not met in person with Morris to go over the Omega Application or any other policy materials.

58. The Rowlands are further informed and believe, but did not realize at the time, that Morris pre-filled two lines on the medical release documents contained in the Omega Application package, falsely indicating that the documents had been signed by Mr. Rowland in Tampa, Florida, when in fact, they were actually signed by Mr. Rowland in North Carolina.

**Amendment to Application and Funding of Omega IUL Policy**

59. On February 23, 2016, Mr. Rowland signed the signature and initial lines throughout the Omega Application as highlighted and directed by Morris and returned it to her for submission to Minnesota Life.

60. Thereafter, at some point between February 23, 2016 and May 10, 2016, Morris advised Mr. Rowland that he would need to submit an initial premium payment of $342,800 to Minnesota Life to fund the Omega IUL Policy.

61. To the best of his recollection, Mr. Rowland expressed concern to Morris that he could not afford the premium payment and that it was larger than what they had discussed.

62. Morris thereafter informed Mr. Rowland that she had made an adjustment to the policy, and his premium payments had been reduced to three payments of $228,000.

63. Sometime between April 27, 2016 and May 10, 2016, Mr. Rowland signed the document attached hereto as Exhibit A, containing "Numeric Summary of Illustrated Values." (hereinafter, the "Omega Illustration Signature Page").

64. The Rowlands are now informed and believe, but did not realize at the time, that the Omega Illustration Signature Page provides in fine print at the bottom of the document that it is "Page 17 of 19."

65. To the best of the Rowlands' recollections and based upon a diligent search of their records, prior to May 10, 2016 and at all other times relevant, the Rowlands had not received the other eighteen (18) pages of the policy illustration referenced on the Omega Illustration Signature Page.

66. On May 10, 2016, acting on Morris' advice and trusting her financial expertise, Mr. Rowland used qualified retirement funds to make the first premium payment of $228,000 on the Omega IUL Policy.

67. Upon information and belief, Minnesota Life issued the Omega IUL Policy on June 2, 2016.

68. To the best of their recollection, and after a diligent search of their records, the Rowlands did not receive a Buyer's Guide or Policy Summary, as defined in N.C. Gen. Stat. § 58-60-10, with the delivery of the Omega IUL Policy or prior to the delivery of the Omega IUL Policy.

**Omissions of Material Fact During the Sale of the Omega IUL Policy**

69. At all times relevant, it was Mr. Rowland's practice to save any written financial plans, illustrations or recommendations that he received from Morris. The Rowlands have conducted a diligent search of their records and emails, and other than the Feb. 2016 Income Plan reflecting $50,000 of income coming in from the proposed Omega IUL "annuity," the Rowlands

{00450743.DOC}

13 of 41

did not receive any other written illustrations or written proposals between February 16, 2016 and February 23, 2016 concerning the Omega IUL Policy.

70. In soliciting the sale of the Omega IUL Policy, in breach of her fiduciary duties to the Rowlands, and at all times relevant, prior to the Rowlands' first premium payment on the Omega IUL Policy, Morris failed to disclose all material facts to them concerning the policy, including the following material facts:

(a) That the Omega IUL Policy was a whole life insurance policy—not an annuity;

(b) That Morris was not licensed to sell life insurance or any insurance product in the State of North Carolina;

(c) An estimate of the amount of *immediate* federal and state tax liability the Rowlands would incur each year by withdrawing funds from qualified retirement accounts in order to fund the projected annual premium payments due on the Omega IUL Policy, as recommended by Morris;

(d) A "Policy Summary," within the meaning of N.C. Gen. Stat. § 58-60-10(7);

(e) A "Buyer's Guide," within the meaning of N.C. Gen. Stat. § 58-60-10(1);

(f) A breakdown of the annual premium for the just the basic Omega IUL Policy;

(g) A breakdown of the annual premium for each optional rider on the Omega IUL Policy;

(h) The guaranteed amount payable on death, at the beginning of the policy year regardless of the cause of death other than suicide, or other specifically enumerated exclusions, which is provided by the basic Omega IUL Policy and

{00450743.DOC}

each optional rider, with benefits provided under the basic policy and each rider shown separately;

(i)  Total guaranteed cash surrender values at the end of the year with values shown separately for the basic policy and each rider;

(j)  Guaranteed endowment amounts payable under the policy which are not included under guaranteed cash surrender values above;

(k) The Life Insurance Cost Index for the premium paying period;

(l)  The effective policy loan annual percentage interest and the maximum annual percentage rate;

(m) That in the event of death, surrender, or policy termination, the proceeds payable on the Omega IUL Policy would be reduced by any policy loans and accrued interest on such loans;

(n) That Morris, in soliciting the Sale of the Omega IUL Policy, was acting as a sales representative of Minnesota Life;

(o)  And in other ways, as may be revealed in discovery in this matter.

## April 2017: Rowlands Begin Questioning Suitability of Omega IUL Policy

71.  On or around April 15, 2017, the Rowlands prepared and filed their 2016 state and federal tax returns and were shocked to discover that by using their qualified retirement funds to pay the first premium due on Omega IUL Policy-- the only source of funds available to pay the full premium, which was, at all times relevant, known by and foreseeable to Morris--- they incurred *immediate* state and federal tax liability of over *$88,000*.

72.     The Rowlands had not incurred any tax liability in 2015 when Mr. Rowland purchased an American Equity Gold annuity that he had been advised to buy by Morris, and the Rowlands had not been informed by Morris or any of the Defendants that using qualified retirement funds to purchase the Omega IUL Policy would trigger immediate tax liability.

73.     In fact, the Rowlands' total state and federal tax liability for the year 2016 was over $163,000; whereas, in the year 2015, it had only been $18,169. The Rowlands lacked sufficient cash and liquid assets outside of their qualified retirement accounts to pay the state and federal taxes owed for 2016.

74.     Shortly after receiving notice of their 2016 income tax liability, the Rowlands set up a Skype meeting with Morris to discuss their financial needs, the strategy for paying the taxes owed, and their concerns about the Omega IUL Policy.

**Solicitation of Second Annual Premium on Omega IUL Policy**

75.     In advance of the planned Skype meeting with Morris, Morris prepared a written document dated April 20, 2017, entitled "The Morris Report." (hereinafter, the "April 2017 Report").

76.     In the April 2017 Report, Morris, in her capacity as the Rowlands' financial advisor and fiduciary, recommended that Mr. Rowland take additional distributions from his qualified retirement accounts to: (i) pay the taxes owed for the year 2016; and (ii) fund necessary living expenses.

77.     Morris further recommended in the April 2017 Report, that the Omega IUL Policy be adjusted so that it was funded in four premium payments instead of three—with the initial

premium of $228,000 that the Rowlands had already paid followed by additional annual premium payments of $171,000, $171,000, and $100,000, respectively.

78.     Morris advised the Rowlands that it was in the Rowlands' best interests to take *another* distribution from Mr. Rowland's qualified retirement accounts of $228,000, and use $171,000 of those retirement funds to pay the second premium on the Omega IUL Policy. Morris recommended that $57,000 of the $228,000 distribution be set aside for the Rowlands' anticipated 2017 tax liability.

79.     In the April 2017 Report, Morris represented to the Rowlands that by funding Omega IUL Policy as set forth above and taking a loan against the policy of $40,000 per year, the Rowlands would have a tax-free income stream of $40,000 per year beginning in year 5 of the policy.

80.     The April 2017 Report further contained an illustration of the Omega IUL Policy, showing that if the Rowlands failed to pay additional premiums and surrendered the policy in the first year, the surrender value on the policy would only be $77,789, which would not even cover the $88,000 of tax liability that had been triggered by the purchase of the policy in the manner advised by Morris.

81.     Thus, according to the April 2017 Report, surrendering the Omega IUL Policy in 2017, during its first year, would result in a *total loss* of the full $228,000 that the Rowlands used to purchase the policy and would still leave the Rowlands with unpaid tax liability.

82.     Between April of 2017 and December 8, 2017, the Rowlands had numerous additional Skype meetings with Morris in which they asked questions and tried to understand the complexities of the Omega IUL Policy and their investment options. During all of these calls and

{00450743.DOC}

Skype conferences, the Rowlands were located in North Carolina, while Morris was located in Tampa, Florida.

83.     During these conferences, with the last one in 2017 occurring on or around December 8, 2017, Morris assured the Rowlands that the benefits of the projected tax-free future income stream that would be generated by the Omega IUL Policy would more than offset the upfront tax costs associated with the policy and that they should fund the policy as recommended in the April 2017 Report.

84.     Relying on the expertise of Morris and trusting that Morris was acting in the Rowlands' best interest in rendering financial advice to the Rowlands, in December of 2017, the Rowlands made a second annual premium payment of $171,000 on the Omega IUL Policy using Mr. Rowland's qualified retirement funds, as directed by Morris in the April 2017 Report.

85.     To the best of their recollection, and after a diligent search of their records, the Rowlands did not receive a Buyer's Guide or Policy Summary with respect to the Omega IUL Policy, as defined in N.C. Gen. Stat. § 58-60-10, at any point prior to making their second annual premium payment of $171,000 on the Omega IUL Policy.

86.     Moreover, in soliciting the second premium payment on the Omega IUL Policy, in breach of her fiduciary duties to the Rowlands, and at all times relevant, prior to the Rowlands' second premium payment on the Omega IUL Policy, Morris failed to disclose all material facts to them concerning the policy, including the following material facts:

(a) That Morris was not licensed to sell life insurance or any insurance product in the State of North Carolina;

(b) An accurate estimate of the amount of *immediate* federal and state tax liability the Rowlands would incur each year by withdrawing funds from qualified retirement accounts in order to fund the projected annual premium payments due on the Omega IUL Policy, as recommended by Morris;

(c) A "Policy Summary," within the meaning of N.C. Gen. Stat. § 58-60-10(7);

(d) A "Buyer's Guide," within the meaning of N.C. Gen. Stat. § 58-60-10(1);

(e) A breakdown of the annual premium for the just the basic Omega IUL Policy;

(f) A breakdown of the annual premium for each optional rider on the Omega IUL Policy;

(g) The guaranteed amount payable on death, at the beginning of the policy year regardless of the cause of death other than suicide, or other specifically enumerated exclusions, which is provided by the basic Omega IUL Policy and each optional rider, with benefits provided under the basic policy and each rider shown separately;

(h) Total guaranteed cash surrender values at the end of the year with values shown separately for the basic policy and each rider;

(i) Guaranteed endowment amounts payable under the policy which are not included under guaranteed cash surrender values above;

(j) The Life Insurance Cost Index for the premium paying period;

(k) The effective policy loan annual percentage interest and the maximum annual percentage rate;

{00450743.DOC}

(l) That in the event of death, surrender, or policy termination, the proceeds payable on the Omega IUL Policy would be reduced by any policy loans and accrued interest on such loans;

(m) That Morris, in soliciting the Sale of the Omega IUL Policy, was acting as a sales representative of Minnesota Life;

(n) And in other ways, as may be revealed in discovery in this matter.

**2018 Tax Liability and Second Opinion As To Suitability of Omega IUL Policy**

87. On or around April 15, 2018, the Rowlands prepared and filed their 2017 state and federal tax returns.

88. Because the Rowlands withdrew qualified retirement funds in order to pay the second reduced premium due on Omega IUL Policy of $171,000 as advised by Morris, the Rowlands incurred *immediate* state and federal tax liability for the year 2017 of over $69,253, which was even higher than the amount estimated by Morris in the April 2017 Report.

89. In mid-2018, concerned about their enormous tax liability and still extremely confused by the complexities of the Omega IUL Policy, the Rowlands began consulting with a new financial advisor in an effort to obtain a second opinion as to the suitability of the Omega IUL Policy for the Rowlands' needs.

90. After further evaluation of the Omega IUL Policy, the Rowlands have learned that the Omega IUL Policy was never suitable for their investment objectives and financial needs nor is it advisable to continue funding the policy.

91. Upon information and belief, Morris persuaded the Rowlands to purchase the Omega IUL Policy purely to advance her own economic interests in earning a hefty commission

{00450743.DOC}

20 of 41

on the sale of the policy in addition to the 1.35% management fee that the Rowlands were already paying for Morris' purported advisory services.

92.      At all times relevant, Morris placed her own economic interests over the Rowlands' financial needs and retirement goals.

93.      Mr. Rowland has continued working beyond his original target retirement date in order to make required monthly installment payments to the IRS and to avoid losing the home that he shares with Mrs. Rowland, which is currently subject to a federal tax lien in excess of $125,000.

94.      In addition to the enormous federal and state tax liability that the Rowlands have incurred because of the improper and self-interested financial advice rendered by Morris, the surrender value of the Omega IUL Policy is substantially less than what was paid for the policy, the Rowlands lack adequate income to fund necessary living expenses, Mr. Rowland has not been able to achieve his retirement goals, and the Rowlands have lost the benefit of investing in and earning interest on suitable investments for a number of years.

95.      Had the Defendants fully and properly disclosed all material facts concerning the Omega IUL Policy, as required by law, Mr. Rowland would not have agreed to purchase the Omega IUL Policy.

## FIRST CLAIM FOR RELIEF
### Breach of Fiduciary Duty—All Defendants

96.      Paragraphs 1 through 95 of this Complaint are incorporated by reference as if fully set forth herein.

97.      At all times alleged herein, including but not limited to, the time in which Morris was rendering investment advice to the Rowlands concerning the Omega IUL Policy, whether the

Omega IUL Policy was a suitable investment, and the manner in which such policy should be funded, in preparing the Omega Application for Mr. Rowland to sign, in soliciting Mr. Rowland to purchase the Omega IUL Policy, and in soliciting the second premium payment on the Omega IUL Policy, Morris was acting as the Rowlands' investment advisor. As such, Defendants, by and through their agent, Morris, owed certain fiduciary duties to the Rowlands. Specifically, Morris and the other Defendants were required to act in good faith, with due care, and in the best interest of the Rowlands as well as to avoid self-dealing transactions in which Morris and the Defendants' interests would be placed above the interests of the Rowlands.

98.     At all times alleged herein, Defendants further owed fiduciary duties to the Rowlands, to fully and fairly disclose all material facts concerning the Omega IUL Policy and to disclose any conflicts of interest which existed.

99.     At all times alleged herein, Plaintiffs reposed special trust and confidence in Morris.

100.    Morris further owed Plaintiffs a duty under the positive law of our state, specifically N.C. Gen. Stat. § 78C-8, not to employ any device, scheme, or artifice to defraud the Rowlands, nor to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon the Rowlands.

101.    As described more particularly above, Morris, while acting in the course and scope of an agency relationship with the Defendants, breached her fiduciary duties by:

> a.  Knowingly making false representations to the Rowlands that the Omega IUL Policy was a suitable investment for Mr. Rowland, when in fact, the Rowlands lacked sufficient income and liquid assets to pay for the Omega IUL Policy without incurring significant tax liability and when such investment was objectively

{00450743.DOC}

unsuitable considering Mr. Rowland's age, other investments, investment time horizon, liquidity needs, risk tolerance, and other information disclosed to Morris;

b.  Knowingly placing her own interests over the retirement goals and financial needs of the Rowlands, in advising Mr. Rowland to purchase the unsuitable Omega IUL Policy;

c.  Intentionally preparing the Omega Application with false and inaccurate information;

d.  Failing to disclose to Mr. Rowland that she had intentionally prepared the Omega Application with false and inaccurate information and advising Mr. Rowland to sign such document;

e.  Failing to disclose, prior to Mr. Rowland's initial funding of the Omega IUL Policy, that the Omega IUL Policy was a whole life insurance policy—not an annuity;

f.  Failing to disclose that Morris was not licensed to sell life insurance or any insurance product in the State of North Carolina;

g.  Failing to provide an accurate estimate of the amount of *immediate* federal and state tax liability the Rowlands would incur each year by withdrawing funds from qualified retirement accounts in order to fund the projected annual premium payments due on the Omega IUL Policy, as recommended by Morris;

h.  Failing to provide the Rowlands with a "Policy Summary," within the meaning of N.C. Gen. Stat. § 58-60-10(7), concerning the Omega IUL Policy;

i.  Failing to provide the Rowlands with a  "Buyer's Guide," within the meaning of N.C. Gen. Stat. § 58-60-10(1), concerning the Omega IUL Policy;

{00450743.DOC}

j.  Failing to provide the Rowlands with a breakdown of the annual premium for the just the basic Omega IUL Policy;

k.  Failing to provide the Rowlands with a breakdown of the annual premium for each optional rider on the Omega IUL Policy;

l.  Failing to disclose the guaranteed amount payable on death, at the beginning of the policy year regardless of the cause of death other than suicide, or other specifically enumerated exclusions, which is provided by the basic Omega IUL Policy and each optional rider, with benefits provided under the basic policy and each rider shown separately;

m.  Failing to disclose the total guaranteed cash surrender values at the end of the year with values shown separately for the basic policy and each rider;

n.  Failing to disclose guaranteed endowment amounts payable under the policy which are not included under guaranteed cash surrender values above;

o.  Failing to disclose the Life Insurance Cost Index for the premium paying period;

p.  Failing to disclose the effective policy loan annual percentage interest and the maximum annual percentage rate on the Omega IUL Policy;

q.  Failing to disclose that in the event of death, surrender, or policy termination, the proceeds payable on the Omega IUL Policy would be reduced by any policy loans and accrued interest on such loans;

r.  Failing to avoid the self-interested transaction in which Morris acted both as the Rowland's investment advisor and as an insurance agent, earning a commission on the sale of the Omega IUL Policy;

{00450743.DOC}

24 of 41

s.   Failing to adequately disclose that Morris, in soliciting the Sale of the Omega IUL Policy, was acting as a sales representative of Minnesota Life;

t.   And in other ways as may be further revealed during discovery.

102.   As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## SECOND CLAIM FOR RELIEF
### Constructive Fraud- All Defendants

103.   Plaintiffs reallege and incorporate by reference paragraphs 1 – 102 of this Complaint as if fully set forth herein.

104.   At all times alleged herein, the attendant facts and circumstances giving rise to this action created a relationship of trust and confidence (i.e. a fiduciary relationship) between Plaintiffs and Morris, who was acting in the course and scope of an agency relations, and this relationship with the Defendants. This relationship surrounded and led up to the transaction in which Mr. Rowland agreed to purchase the Omega IUL Policy based upon misleading statements and inadequate and incomplete disclosures of material facts.

105.   The Defendants advantaged and benefitted themselves in a pecuniary fashion by virtue of their fiduciary relationship with Plaintiffs and by the conduct alleged herein.

106.   The breaches of fiduciary duty alleged herein constituted a constructive fraud upon Plaintiffs, and, as a direct and proximate result of the Defendants' constructive fraud, Plaintiffs have been damaged in an amount in excess of Seventy-Five Thousand Dollars ($10,000), said amount to be shown at the trial of this action.

{00450743.DOC}

## THIRD CLAIM FOR RELIEF
## Common Law Fraud- All Defendants

107.    Plaintiffs reallege and incorporate by reference paragraphs 1 - 106 of this Complaint as if fully set forth herein.

108.    As described more particularly above, in order to induce Mr. Rowland to invest in the Omega IUL Policy and to execute certain papers associated with said transaction, including the Omega Application and amended application, Morris, while acting in the course and scope of an agency relationship with all Defendants, intentionally concealed numerous material facts including, but not limited to the following:

  a.  That the Omega IUL Policy was a whole life insurance policy—not an annuity;

  b.  That Morris was not licensed to sell life insurance or any insurance product in the State of North Carolina;

  c.  An estimate of the amount of *immediate* federal and state tax liability the Rowlands would incur each year by withdrawing funds from qualified retirement accounts in order to fund the projected annual premium payments due on the Omega IUL Policy, as recommended by Morris;

  d.  A "Policy Summary," within the meaning of N.C. Gen. Stat. § 58-60-10(7);

  e.  A "Buyer's Guide," within the meaning of N.C. Gen. Stat. § 58-60-10(1);

  f.  A breakdown of the annual premium for the just the basic Omega IUL Policy;

  g.  A breakdown of the annual premium for each optional rider on the Omega IUL Policy;

  h.  The guaranteed amount payable on death, at the beginning of the policy year regardless of the cause of death other than suicide, or other specifically enumerated

{00450743.DOC}

exclusions, which is provided by the basic Omega IUL Policy and each optional rider, with benefits provided under the basic policy and each rider shown separately;

i.  Total guaranteed cash surrender values at the end of the year with values shown separately for the basic policy and each rider;

j.  Guaranteed endowment amounts payable under the policy which are not included under guaranteed cash surrender values above;

k.  The Life Insurance Cost Index for the premium paying period;

l.  The effective policy loan annual percentage interest and the maximum annual percentage rate;

m.  That in the event of death, surrender, or policy termination, the proceeds payable on the Omega IUL Policy would be reduced by any policy loans and accrued interest on such loans;

n.  That Morris, in soliciting the Sale of the Omega IUL Policy, was acting as a sales representative of Minnesota Life;

o.   And in other ways, as may be revealed in discovery in this matter.

109.    At all times alleged herein, the Defendants had an affirmative duty to make a full and fair disclosure of the material facts described above, yet intentionally failed to do so.

110.    In order to further induce Mr. Rowland to purchase the Omega IUL Policy and to sign certain papers associated with said transaction, Morris made knowingly false statements to Plaintiffs.  Specifically, Morris referred to the Omega IUL in the February 2016 Income Plan as an "annuity," when in fact, it was a whole life insurance policy. Morris likewise falsely advised

{00450743.DOC}

27 of 41

Mr. Rowland that the Omega IUL Policy was a suitable investment to achieve his retirement goals and that it was in the Rowlands' best financial interest to "re-design" their retirement portfolio by using qualified retirement funds to purchase the Omega IUL Policy, when at all times relevant, she knew that Omega IUL Policy was not a suitable investment for Mr. Rowland.

111.    The affirmative misrepresentations and concealment of material facts by the Defendants were reasonably calculated to deceive Plaintiffs and were intended to deceive Plaintiffs.

112.    In reasonable reliance on the Defendants' affirmative misrepresentations and concealment of material facts, Mr. Rowland agreed to take distributions from qualified retirement accounts, to purchase the Omega IUL Policy, and to sign the Omega Application and other documents described more particularly above.

113.    But for the Defendants' material omissions described above, Mr. Rowland would not have agreed to take distributions from qualified retirement accounts, to purchase the Omega IUL Policy, nor to sign the Omega Application and other documents described more particularly above.

114.    As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

### FOURTH CLAIM FOR RELIEF
**North Carolina Investment Advisors Act- Morris, Morris FES, Global Financial**

115.    Plaintiffs reallege and incorporated by reference paragraphs 1 - 114 of this Complaint as if fully set forth herein.

{00450743.DOC}

28 of 41

116.    As alleged more particularly above, at all times relevant, Morris, Morris FES, and Global Financial received consideration from the Rowlands in exchange for the rendering of advice as to the value of securities or their purchase or sale, through the issuance of analysis and reports.

117.    As alleged more particularly above, Morris, Morris FES, and Global Financial, employed a "device, scheme or artifice to defraud" the Rowlands and engaged in an "act, practice or course of business which operates or would operate as a fraud or deceit" on the Rowlands, in violation of N.C. Gen. Stat. § 78C-8(a)(2) or (2).

118.    As a direct and proximate result of Morris, Morris FES, and Global Financial's violations of the North Carolina Investment Advisors Act, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action. Plaintiffs are further entitled to recover the costs of bringing this action and reasonable attorneys' fees.

## FIFTH CLAIM FOR RELIEF
### Breach of Contract- Morris, Morris FES, Global Financial

119.    Plaintiffs reallege and incorporate by reference paragraphs 1 - 118 of this Complaint as if fully set forth herein.

120.    Upon information and belief, Plaintiffs entered into a contract with Morris, Morris FES, and/or Global Financial in which Plaintiffs paid a fee of 1.35% of the portfolio managed by such defendants in exchange for investment advisory services, in which such Defendants were to assist Plaintiffs in making sound, suitable investment decisions, which were consistent with their fiduciary obligations to them.

{00450743.DOC}

121. In entering into such contract, Morris, Morris FES, and Global Financial assumed implied duties of good faith and fair dealing and to comply with applicable laws and industry standards.

122. As described and alleged more particularly above, Morris, Morris FES, Global Financial, breached their contractual obligations to the Rowlands by advising them to invest in a life insurance policy which was unsuitable for the Rowlands under objective industry standards and to take distributions from qualified retirement accounts, which they knew should have known, would result in immediate economic damage, including significant federal and state tax consequences, and in other ways as alleged more particularly above.

123. As a direct and proximate result of Morris, Morris FES, and Global Financial's breach of contract, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## SIXTH CLAIM FOR RELIEF
**Negligence- Morris, Morris FES, Global Financial**

124. Plaintiffs reallege and incorporate by reference paragraphs 1 - 123 of this Complaint as if fully set forth herein.

125. At all times relevant, in undertaking to render investment advisory services and to provide investment and financial advice to Plaintiffs, Morris, Morris FES, and Global Financial owed Plaintiffs a duty of reasonable, ordinary care.

126. Morris FES and Global Financial, directly and/or by and through the acts of their agent, Morris, breached their duties of care to Plaintiffs and were negligent in various respects, including but not limited to:

{00450743.DOC}

a. Representing to Plaintiffs that Mr. Rowland could obtain "tax free" income by withdrawing funds from qualified retirement accounts and purchasing the Omega IUL Policy, when such Defendants knew or should have known, that such transactions would result in immediate, front-loaded tax liability of over 30%;

b. Recommending that Mr. Rowland purchase a life insurance policy that he could not afford, and which such defendants knew or should have known was unsuitable for his needs;

c. Failing to make accurate statements of material fact about the Omega IUL Policy;

d. Failing to disclose all material information to Plaintiffs about the Omega IUL Policy;

e. Failing to use reasonable care to supervise Morris;

f. Failing to use reasonable care to ensure that Morris complied with all applicable laws and industry standards in rendering financial advice to Plaintiffs;

g. Failing to use reasonable care to ensure that Morris complied with all applicable laws and industry standards in selling life insurance to Mr. Rowland;

h. And in other ways as may be revealed through discovery.

127.     As a direct and proximate result of Morris, Morris FES, and Global Financial's negligence, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## SEVENTH CLAIM FOR RELIEF
### Violation of North Carolina Unfair and Deceptive Trade Practices Act-
### Morris, Minnesota Life

128.     Plaintiffs reallege and incorporate by reference paragraphs 1 - 127 of this Complaint as if fully set forth herein.

129.     North Carolina General Statute § 75-1.1 (a) declares unfair and deceptive acts or practices in or affecting commerce unlawful.

130.     The Omega IUL Policy is a life insurance policy within the scope of N.C. Gen. Stat. § 58-60-5.

131.     At all times relevant, Morris was acting with the consent of, under the control and supervision of, and within her authority to act as an employee or agent of Minnesota Life.

132.     As alleged more particularly above, Minnesota Life, by and through its agent, Morris, engaged in unfair and deceptive trade practices and acted intentionally, willfully, and with reckless disregard for Plaintiffs' rights and for the established policy in this State, and further acted in a manner that was deceptive, immoral, unethical, and unscrupulous, as follows:

   a.   Using the term "investment advisor" to imply that Morris' compensation was unrelated to the sale of insurance policies, in violation of N.C. Gen. Stat. § 58-60-20;

   b.   Selling an insurance product without a proper license;

   c.   Using an "Income Plan" prepared as part of investment advisory service to solicit the purchase of a life insurance policy;

   d.   Soliciting the purchase of a life insurance policy by deceptively referring to the life insurance policy as an "annuity;"

{00450743.DOC}

e. Affirmatively representing to the Rowlands that the purchase of the Omega IUL Policy would result in a stream of "tax-free" income, without disclosing that funding such policy in the manner recommended (i.e. by using existing qualified retirement funds) would result in immediate tax liability of over 30%;

f. Failing to disclose to Mr. Rowland that portions of the Omega Application had been entered on his behalf in a fraudulent manner and advising him to sign the document;

g. Only presenting Mr. Rowland with select pages of a policy illustration that had been prepared with respect to the Omega IUL Policy;

h. Misrepresenting the benefits, advantages, conditions and/or terms of the Omega IUL Policy in order to induce Mr. Rowland to purchase such policy;

i. Failing to provide or deliver a Buyer's Guide, or a Policy summary, to the Rowlands as required by N.C. Gen. Stat. §58-60-15(a) and (b);

j. To the extent that the Omega IUL Policy is deemed to be an annuity, rather than a life insurance policy, recommending the purchase of the Omega IUL Policy without a reasonable basis to believe that the recommendation is suitable for the consumer on the basis of the facts disclosed by the consumer as to the consumer's investments and other insurance products and as to the consumer's financial situation and needs;

k. To the extent that the Omega IUL Policy is deemed to be an annuity, rather than a life insurance policy, failing to take reasonable steps to obtain the consumer's tax status in making recommendations to the consumer;

l. To the extent that the Omega IUL Policy is deemed to be an annuity, rather than a life insurance policy, failing to assure that a system to supervise recommendations is reasonably designed to achieve compliance with the North Carolina Suitability in Annuity Transactions Act; and

m. In other ways as may be revealed through discovery.

133. As a direct and proximate result of Morris and Minnesota Life's violations of N.C. Gen. Stat. § 75-16, Plaintiffs are entitled to recover treble their actual damages resulting from such defendants' unfair and deceptive trade practices, and reasonable attorney's fees and costs, in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## EIGHTH CLAIM FOR RELIEF
### Negligence- Morris, Morris FES, Global Financial

134. Plaintiffs reallege and incorporate by reference paragraphs 1 - 133 of this Complaint as if fully set forth herein.

135. At all times relevant, Morris, Morris FES, and Global Financial owed Plaintiffs a duty of ordinary care. This duty arose by reason of Defendants undertaking to provide investment advisory services to Plaintiffs.

136. At all times alleged herein, in light of the financial circumstances, investment objectives, lack of knowledge and experience in financial matters, income, liquidity needs, retirement goals and existing investments, Morris FES and Global Financial, by and through its agent, Morris, had no reasonable basis to believe that the Omega IUL Life Insurance Policy was a suitable investment for Mr. Rowland.

{00450743.DOC}

137.    Morris FES and Global Financial, by and through its agent, Morris, breached their duty of ordinary care and were negligent in:  (1) misrepresenting material facts and failing to disclose material facts Plaintiffs; (2) offering and selling life insurance in violation of North Carolina Law; (3) failing to exercise ordinary care, (4) recommending an unsuitable life insurance product, and (5) and in other ways as may be revealed through discovery.

138.    As a direct and proximate result of Morris, Morris FES, and Global Financial's negligent conduct, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## NINTH CLAIM FOR RELIEF

**Alternative Claim, Negligent Selection of Independent Contractor- Minnesota Life**

139.    Plaintiffs reallege and incorporate by reference paragraphs 1 - 138 of this Complaint as if fully set forth herein.

140.    In the event that it should be determined that Morris was an independent contractor and did not act in a master-servant agency relationship with Minnesota Life, at the times alleged in this Complaint, then Plaintiffs allege, in the alternative, that Minnesota Life was negligent in its selection of Morris as a representative and independent contractor.

141.    At all times relevant, Minnesota Life owed Plaintiffs a duty of ordinary care and a duty to comply with North Carolina statutes in selling insurance products to, and collecting premiums from, residents of the State of North Carolina, including Mr. Rowland.

142.    At all times alleged herein, upon information and belief, Morris was not licensed to sell life insurance or any other insurance product in the State of North Carolina and was inherently

{00450743.DOC}

unfit to sell a life insurance policy to Mr. Rowland, who was at all times relevant located and residing in the State of North Carolina.

143.    Upon information and belief, at all times relevant, but unbeknownst to Plaintiffs, Morris had been sanctioned in the State of Florida for conduct similar to the allegations set forth in this Complaint, including allegations of fraud and dishonest conduct by Morris.

144.    The Omega Application disclosed that, prior to the issuance of the Omega IUL Policy, Mr. Rowland lived in and was located within the boundaries of North Carolina.

145.    At all times relevant, Minnesota Life knew or should have known that Morris was incompetent and inherently unfit to sell the Omega IUL Policy by virtue of her lack of appropriate North Carolina licensing and by her prior misconduct in Florida.

146.    Morris' incompetence in selling the Omega IUL Policy was a proximate cause of the damages sustained by Plaintiffs.

147.    As a direct and proximate result of Minnesota Life's negligent selection of Morris as a representative and an independent contractor, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

## TENTH CLAIM FOR RELIEF
### Alternative Claim, Negligent Retention of Independent Contractor- Minnesota Life

148.    Plaintiffs reallege and incorporate by reference paragraphs 1 – 147 of this Complaint as if fully set forth herein.

149.    In the event that it should be determined that Morris was an independent contractor and did not act in a master-servant agency relationship with Minnesota Life, at the times alleged

{00450743.DOC}

in this Complaint, then Plaintiffs allege, in the alternative, that Minnesota Life was negligent in its retention of Morris.

150. At all times relevant, Minnesota Life owed Plaintiffs a duty of ordinary care and a duty to comply with North Carolina statutes in selling insurance products to and collecting premiums from residents of the State of North Carolina, including Plaintiffs.

151. At all times alleged herein, upon information and belief, Morris was not licensed to sell life insurance or any other insurance product in the State of North Carolina and was inherently unfit to sell a life insurance policy to Mr. Rowland.

152. Upon information and belief, at all times relevant, but unbeknownst to Plaintiffs, Morris had been sanctioned in the State of Florida for conduct similar to that which is alleged in this Complaint, including allegations of fraud and dishonest conduct by Morris.

153. The Omega Application disclosed that, prior to the issuance of the Omega IUL Policy, Mr. Rowland lived in and was located within the boundaries of North Carolina.

154. At all times relevant, Minnesota Life knew or should have known that Morris was incompetent and inherently unfit to sell the Omega IUL Policy by virtue of her lack of appropriate North Carolina licensing and by her prior misconduct in Florida.

155. Morris' incompetence in selling the Omega IUL Policy was a proximate cause of the damages sustained by Plaintiffs.

156. As a direct and proximate result of Minnesota Life's negligent retention of an independent contractor, Plaintiffs have been damaged in an amount in excess of Seventy-five Thousand Dollars ($75,000), said amount to be shown at the trial of this action.

{00450743.DOC}

## ELEVENTH CLAIM FOR RELIEF
### Declaratory Judgment- Morris, Minnesota Life

157.    Plaintiffs reallege and incorporate by reference paragraphs 1 - 156 of this Complaint as if fully set forth herein.

158.    As alleged more particularly above, Minnesota Life and Morris, through affirmative misstatements and omissions of material fact, misrepresented the benefits, advantages, conditions and/or terms of the Omega IUL Policy in order to induce Mr. Rowland to purchase such policy and such defendants sold the policy through acts which violated the positive law of the State of North Carolina.

159.    There is an actual justiciable controversy concerning the enforceability of the Omega IUL Policy.

160.    Pursuant to the Declaratory Judgment Act, N.C. Gen. Stat. § 1-253 et seq., Plaintiffs are entitled to a declaratory judgment that the Omega IUL Policy is subject to avoidance and is null and void, as Plaintiffs have shown that its execution was procured by fraud and constructive fraud arising from the Morris' breach of their fiduciary duties.

161.    Plaintiffs are further entitled to a declaratory judgment that the Omega IUL Policy is null and void to the extent that it otherwise purports to authorize the Director Defendants to engage in conduct forbidden by the positive law of this State, but not limited to conduct that is expressly prohibited by the North Carolina Life Insurance Disclosure Act (N.C. Gen. Stat. § 58-60-1, *et seq.*) and licensing statutes governing the sale of insurance in North Carolina (N.C. Gen. Stat. §58-33-1, *et seq.*).

## TWELFTH CLAIM FOR RELIEF
### Punitive Damages- All Defendants

162.     Plaintiffs reallege and incorporate by reference paragraphs 1 - 161 of this Complaint as if fully set forth herein.

163.     The conduct of Defendants, as described more particularly above, constitutes willful and wanton conduct, as well as a conscious and intentional indifference to the rights of Plaintiffs.

164.     Defendants further engaged in constructive fraud and common law fraud. Defendants are therefore liable for punitive damages in accordance with N.C. Gen. Stat. § 1D-5.

165.     As a result of the fraudulent, wanton, willful and reckless misconduct alleged herein, Defendants are jointly and severally liable to Plaintiffs for punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray the Court that:

1.     Pursuant to the First, Second, and Third Claims for Relief, Plaintiffs recover damages against the all Defendants, jointly and severally, in an amount in excess of $75,000, said amount to be proven at the trial of this action;

2.     Pursuant to the Fourth, Fifth, Sixth, and Eighth Claims for Relief, Plaintiffs recover damages against Morris, Morris FES, and Global Financial, jointly and severally, in an amount in excess of $75,000, said amount to be proven at the trial of this action;

3.     Pursuant to the Seventh Claim for Relief, Plaintiffs recover against Morris and Minnesota Life, jointly and severally, an amount in excess of $75,000, said amount to be proven at the trial of this action;

{00450743.DOC}

4. In the alternative, Pursuant to the Ninth and Tenth Claim for Relief, Plaintiffs recover against Minnesota life an amount in excess of $75,000, said amount to be proven at the trial of this action.

5. Pursuant to the Eleventh Claim for Relief, the Court enter a judgment declaring that:

   a. The Omega Application and other documents executed by Mr. Rowland in order to purchase the Omega IUL Policy, along with the Omega IUL Policy itself, were procured through fraud and constructive fraud and acts which violate the positive law of this State are therefore null and void;

6. Pursuant to the Twelfth Claim for Relief, Plaintiffs recover punitive damages against Defendants in an amount to be determined by the trier of fact;

7. That Plaintiffs be awarded treble damages as allowed by law;

8. The costs of this action, including reasonable attorneys' fees, be taxed against Defendants;

9. Plaintiffs have trial by jury on all issues so triable; and

10. Plaintiffs have such other and further relief as the Court deems just and proper.

This the 31st day of May, 2019

Respectfully Submitted,

**_s/ Brooke A. Howard_**
Brooke A. Howard
HOWARD LAW, PLLC
NC #36584
111 Windel Drive, Suite 201
Raleigh, NC 27609
(919) 446-5193
(919) 882-9757  facsimile
bah@howardlawpllc.com

*Attorneys for Plaintiffs*

{00450743.DOC}