# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### STATESVILLE DIVISION
### CIVIL ACTION NO. 5:19-CV-00069-KDB-DCK

| | |
|---|---|
| **DONNA ROWLAND AND BARRY ROWLAND,** | |
| **Plaintiffs,** | |
| **v.** | **ORDER** |
| **MINNESOTA LIFE INSURANCE COMPANY; GLOBAL FINANCIAL PRIVATE CAPITAL, LLC; SANDY MORRIS FINANCIAL & ESTATE PLANNING SERVICES, LLC; GF INVESTMENT SERVICES, LLC; AND SANDEVA O'BRYAN MORRIS,** | |
| **Defendants.** | |

**THIS MATTER** is before the Court on Defendants Sandeva O'Bryan Morris ("Sandy Morris") and Sandy Morris Financial & Estate Planning Services, LLC's ("SMF") (together the "Morris Defendants") Motion to Dismiss for Lack of Jurisdiction or Alternatively to Transfer to the Middle District of Florida, Motion to Dismiss for Lack of Jurisdiction or Alternatively for Failure to State a Claim as to Plaintiff Donna Rowland and Motion to Stay and Compel Arbitration (Doc. Nos. 23, 25 and 26) and Defendant Global Financial Private Capital, LLC's ("GFPC") Motion to Dismiss Complaint (Doc. No. 20).

With due regard for the applicable standards of review of motions to dismiss pursuant to Rule 12 and motions to stay and compel arbitration, the Court finds that Plaintiffs have at this early stage of the case made a prima facie showing of personal jurisdiction over the Morris Defendants

and adequately pled their claims against GFPC and on behalf of Plaintiff Donna Rowland. Further, the Morris Defendants (the only defendants to request a transfer of venue) have not shown that this action should be transferred to the Middle District of Florida nor have they established their entitlement to compel arbitration because the Court finds that there is no valid agreement to arbitrate the parties' dispute. Accordingly, as more fully discussed below, the Court will **DENY** these motions.

## I.     LEGAL STANDARD

### A.     Personal Jurisdiction

When personal jurisdiction is properly challenged under Rule 12(b)(2), the burden is on the plaintiff ultimately to prove the Court's jurisdiction over the defendants by a preponderance of the evidence. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). However, "when the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). In deciding whether the plaintiff has made the requisite showing, the Court must construe all allegations and evidence available relating to the issue of personal jurisdiction in the light most favorable to the plaintiff. *Id*.

Rule 4 of the Federal Rules of Civil Procedure prescribes that state law controls the extent to which a federal court may exercise personal jurisdiction over a defendant. Fed. R. Civ. P. 4(k)(1)(A). Accordingly, North Carolina's Long Arm Statute, N.C. Gen. Stat. Ann. § 1-75.4, governs the reach of federal courts in North Carolina over out-of-state defendants, subject to the federal constitutional constraints of the Due Process Clause of the Fourteenth Amendment on the

state's application of its long-arm statute. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011). Courts have long held, however, that North Carolina's long-arm statute extends to the maximum boundaries allowed by the Due Process Clause; therefore, what would otherwise be a two-step analysis, *English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990), essentially folds into one: "whether the defendant has such 'minimal contacts' with the forum state that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Christian Sci. Bd. of Directors of First Church of Christ, Scientist v. Nolan,* 259 F.3d 209, 215 (4th Cir. 2001) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (US 1945)).

To establish minimum contacts, a plaintiff may pursue either general or specific jurisdiction. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc*., 293 F.3d 707, 711–12 (4th Cir. 2002). To establish general jurisdiction, the defendant's activities in the state must have been "continuous and systematic." *Id*. If specific jurisdiction is alleged (as in this case), the court exercises its power over a defendant when defendant's contacts within the state are the basis of the plaintiff's cause of action. *Id*.

In analyzing the contacts for specific jurisdiction, courts "consider (1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *Id*.; *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8 (1984). In conducting this inquiry, the Court must focus on "the quality and nature of [the relevant] contacts." *Nichols v. G.D. Searle & Co*., 783 F.Supp. 233, 238 (D.Md.1992), *aff'd*, 991 F.2d 1195 (4th Cir.1993). The Court should not "merely ... count the contacts and quantitatively compare this case to other preceding cases." *Id*. Even a single contact may be sufficient to create jurisdiction when the cause of action arises

out of that single contact, provided that the principle of "fair play and substantial justice" is not thereby offended. *Id*. (*citing Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–78 (1985)).

**B.    Transfer of Venue**

In addition to personal jurisdiction, the Morris Defendants – but not any of the other defendants – challenge the venue of this action pursuant to Rule 12(b)(3) and 28 U.S.C. § 1391(b). Under section 1391(b), a civil action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;" or "(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." 28 U.S.C. § 1391(b). The statute further clarifies that "an entity with the capacity to sue and be sued in its common name under applicable law ... shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id*. § 1391(c)(2).

Also, even if proper venue exists under section 1391(b), Section 1404(a) of Title 28 of the United States Code provides that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh, Corp*., 487 U.S. 22, 29 (1988) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).

The burden is on the movant to show that transfer pursuant to Section 1404(a) is proper. *Sauer Brands, Inc. v. Duke Sandwich Products, Inc*., No. 3:19-cv-00508, 2020 WL 90663, at **2-

3 (W.D.N.C. January 7, 2020); *Cognitronics Imaging Sys., Inc. v. Recognition Research Inc*., 83 F.Supp.2d 689, 696 (E.D.Va.2000). In evaluating whether to transfer a case to another jurisdiction, the Court must weigh a number of factors to determine whether Defendants have met their burden to transfer venue. As the Court has previously stated,

> In considering a motion to transfer, a court should consider, among other things, [1] the plaintiff's initial choice of forum; [2] the residence of the parties; [3] the relative ease of access of proof; [4] the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses; [5] the possibility of a view; [6] the enforceability of a judgment, if obtained; [7] the relative advantages and obstacles to a fair trial; [8] other practical problems that make a trial easy, expeditious, and inexpensive; [9] the administrative difficulties of court congestion; [10] the interest in having localized controversies settled at home [and] the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action; [11] and the avoidance of unnecessary problems with conflict of laws.

*Commercial Equip. Co., Inc. v. Barclay Furniture Co*., 738 F. Supp. 974, 976 (W.D.N.C. 1990). As with jurisdiction, "the analysis of these factors is qualitative, not merely quantitative." *Id.*

In seeking a discretionary transfer of venue, defendants "carr[y] a particularly heavy burden," as "[a] court should not disturb the plaintiff's choice of forum unless the moving party demonstrates that the balance of convenience to the parties and witnesses and the interests of justice weigh heavily in favor of the transfer to another district." *Id.* (citations omitted). The mere shifting of inconvenience from one party to another will not satisfy Defendants' burden. *Id.*; *see also Uniprop Manufactured Hous. Cmtys. Income Fund II v. Home Owners Funding Corp*., 753 F. Supp. 1315, 1322 (W.D.N.C. 1990) (noting that "if the equities lean but slightly in favor of the movant after all factors are considered," transfer is still not appropriate).

### C. Arbitration

"Whether the parties have agreed to arbitrate their disputes is a jurisdictional question," and where all of the claims at issue in a lawsuit are arbitrable, the court may dismiss the lawsuit

for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). *Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC*, 792 F. Supp. 2d 897, 900 (E.D.N.C. 2011); *see also Bhd. of Ry. & S.S. Clerks, Freight Handlers, Express & Station Emp. v. Norfolk S. Ry. Co.*, 143 F.2d 1015, 1017 (4th Cir. 1944) ("Arbitration deprives the judiciary of jurisdiction over the particular controversy and the courts have long ruled that there must be strict adherence to the essential terms of the agreements to arbitrate."); *Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001) ("[D]ismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable.").

Alternatively, where the claims at issue are arbitrable, a court may stay a lawsuit pending the parties' completion of arbitration. *See* 9 U.S.C. § 3 (mandating a stay of an action upon application of one of the parties and the court's satisfaction that the issues involved are referable to arbitration); *Silkworm Screen Printers, Inc. v. Abrams*, No. 91-1631, 1992 WL 317187, at *6 (4th Cir. Nov. 4, 1992) ("If the district court finds that [plaintiff] agreed to arbitrate . . . it may either dismiss [plaintiff's] complaint for lack of subject matter jurisdiction or stay its proceedings pending arbitration and consideration of the award pursuant to Article V of the Convention."). Federal policy strongly favors arbitration, and the Federal Arbitration Act ("FAA") represents "a liberal federal policy favoring arbitration agreements" and applies "to any arbitration agreement within the coverage of the [FAA]." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Specifically, under the FAA, a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

At the same time, it is well-settled that a "party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260,

266 (4th Cir.2011). Therefore, "before referring a dispute to an arbitrator, the Court determines whether a valid arbitration agreement exists," *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ___ U.S. ___, 139 S.Ct. 524, 530 (2019); *Berkeley County School District v. Hub International Limited, et al.*, 944 F.3d 225 (4th Cir. 2019) ("Section 4 [of the Federal Arbitration Act] thus requires that the district court – rather than an arbitrator – decide whether the parties have formed an agreement to arbitrate"). In determining whether the party seeking to compel arbitration has established a valid agreement to arbitrate, *see In re Mercury Constr. Corp.,* 656 F.2d 933, 939 (4th Cir. 1981), *aff'd sub nom. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1 (1983)*,* the Court looks to relevant state contract law principles. *Hill v. Peoplesoft USA, Inc*., 412 F.3d 540, 543 (4th Cir. 2005). Because the Plaintiffs lived in North Carolina at the time the Asset Management Agreement ("AMA") on which the Morris Defendants rely was purportedly executed, North Carolina law governs the formation of the asserted arbitration agreement. *See* Doc. No. 36-6, at 45, AMA at p. 10, ¶23.

### D.     Failure to State a Claim under Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, ... bare assertions devoid of further factual enhancement[,] ... unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 255 (4th Cir.

2009). Construing the facts in this manner, a complaint must only contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II.   FACTS AND PROCEDURAL HISTORY

Plaintiff Barry Rowland works in construction management and his wife Plaintiff Donna Rowland is a registered nurse. Doc. No. 1, Complaint at ¶2. In 2013, the Rowlands bought property in Sherrills Ford, North Carolina, to which they moved permanently in mid-2014, after their daughter graduated from high school in Florida. Doc. 36 at 1-2.  Plaintiffs allege that Sandy Morris is an "investment advisor and fiduciary" who lives in Hillsborough County (Tampa), Florida. Doc. No. 1, ¶¶ 2, 8.   Mr. Rowland first met Morris in 2014 (after the Rowlands had sold their Florida residence but before he moved permanently to North Carolina) at a social security seminar that she hosted in Tampa. *Id*., ¶ 18. In July 2014 Morris began providing written financial plans and oral financial advice to the Rowlands, which led to the sale of two annuities by Morris to Mr. Rowland in 2015, after he had relocated to North Carolina. Doc. No. 36 at 2. The parties' relationship continued with Morris in Florida and her clients the Rowlands in North Carolina during 2015 and into 2016. In February 2016 Morris sent the Rowlands a written proposed financial plan (the "2016 Financial Plan") projecting both their future income streams and determining that the couple would have a collective "income gap" of more than $41,000 per year in retirement, Doc. No. 1,  ¶¶ 24,  26-32,  97.

To address this "gap," Morris proposed that Mr. Rowland sell stock held inside of his employer's retirement (401k) plan and use those funds to purchase an  Omega  Builder  Indexed

Universal Life Insurance Policy issued by Defendant Minnesota Life Insurance Company (the "Omega IUL Policy" or "the Policy"), which was allegedly referred to as an "annuity" in the 2016 Financial Plan. *Id.*, ¶¶ 34, 53. Morris further recommended that $950,000 of Mr. Rowland's savings be transferred to "an investment account managed by Morris so that his portfolio could be reallocated." *Id.*, ¶ 34. Plaintiffs allege that in providing this written financial advice and promoting and selling the Policy in various Skype conference calls to North Carolina, Sandy Morris was acting as a fiduciary and the agent of SMF, GFPC and/or Minnesota Life Insurance Company. *Id.*, ¶¶ 13, 19, 22-23.

The Rowlands accepted Morris' advice, and Mr. Rowland purchased the Policy allegedly believing, based on Morris' representations, that it would provide the Rowlands substantial tax free retirement income. *Id.* at ¶¶ 34, 38. (Plaintiffs also allege that Morris made numerous false representations in filling out the policy application, *Id.* at ¶¶ 40-58). Ultimately, to make premium payments in 2016 and 2017, Mr. Rowland withdrew approximately $400,000 from his qualified retirement accounts in order to purchase and fund the Omega IUL Policy. However, these transactions allegedly caused the Rowlands to unexpectedly incur joint federal and state tax liability of $88,350 and $69,253.29, which they say that they lack sufficient income and liquid assets to pay. *Id.* ¶¶ 3-4, 39. Accordingly, Plaintiffs currently have a tax lien against their home in an amount in excess of $125,000. *Id.* ¶ 4.

This action was filed on May 31, 2019 as an alleged diversity action pursuant to 28 U.S.C. § 1332. The Complaint asserts twelve claims for relief based on the defendants' alleged breaches of fiduciary duty, constructive fraud, common law fraud, negligence, breach of contract and claims for violation of the North Carolina Investment Advisors Act and statutory unfair and

deceptive trade practices. Plaintiffs also seek a declaratory judgment declaring that the Policy is "null and void" and punitive damages. *See Id.*, ¶¶ 96-165.

As noted above, the Morris Defendants have filed multiple motions in response to the Complaint. They challenge whether this Court has personal jurisdiction over them due to an alleged lack of minimum contacts with the State of North Carolina. Second, they challenge the venue of this Court and ask that the case be transferred to the Middle District of Florida where they reside. None of the other defendants have joined in that request. Third, along with defendant GFPC, they challenge whether Plaintiff Donna Rowland has standing to assert any of the claims alleged in the Complaint or alternatively whether the Complaint sets forth sufficient factual detail to plausibly state a claim on her behalf. Finally, they seek to have any claims not otherwise dismissed or transferred compelled to arbitration in accordance with an arbitration provision contained in the AMA. Defendant GFPC has also separately moved to dismiss the claims against it on the grounds that the Complaint fails to contain sufficient allegations to support those claims. Defendant Minnesota Life Insurance Company has answered the Complaint, denying it is liable to the Plaintiffs.

## III. DISCUSSION

As described above, defendants raise a number of challenges to the Rowlands' claims, each of which will be denied. The Court will first address the Morris Defendants' arguments on personal jurisdiction, venue and arbitration. Then, the Court will address the Rule 12(b)(6) arguments that the Complaint fails to state a claim against GFPC or on behalf of Donna Rowland.

### A. Personal Jurisdiction

With respect to the Court's personal jurisdiction over the Morris Defendants, the parties generally agree on the governing legal test, but predictably disagree over its application. In

summary, Plaintiffs argue that the Morris Defendants have (1) purposefully availed themselves of the privilege of conducting activities in North Carolina, (2) Plaintiffs' claims arise out of those activities, and (3) the exercise of personal jurisdiction would be constitutionally "reasonable," such that the Morris Defendants can be held subject to specific jurisdiction in North Carolina. *See Carefirst,* 334 F.3d at 396. The Court agrees.

The Morris Defendants place great emphasis on the initial meetings with Mr. Rowland in Florida. However, there is no dispute (and if there was it would have to be resolved in favor of Plaintiffs in accordance with the applicable standards) that even as of the time of the initial meetings Plaintiffs had sold their home in Florida and told Ms. Morris that they would be soon relocating to North Carolina. In response, Ms. Morris allegedly agreed to begin and then develop an ongoing financial working relationship with the Rowlands in North Carolina from 2014 into 2018. More specifically, the parties' discussions concerning the 2016 Financial Plan and the purchase and funding of the Policy which allegedly damaged the Plaintiffs all occurred through communications into North Carolina or while Plaintiffs were living in North Carolina. The Morris Defendants plainly intended to pursue, maintain and benefit from a business relationship with North Carolina residents, from which the Rowlands' claims admittedly arise. Further, under these circumstances, the Court finds that it is constitutionally reasonable for the Morris Defendants to answer to the Plaintiffs' claims in North Carolina.[1] Accordingly, the Court finds that the Plaintiffs have, at a minimum, made a prima facie showing that the Morris Defendants are subject to personal jurisdiction in this Court.

---

[1] While it is not dispositive (because they may be subject to general jurisdiction in the state), the Court notes that the other defendants in this action, which appear to have had much less direct involvement with the Plaintiffs in North Carolina, have not challenged the Court's jurisdiction.

### B.       Transfer of Venue

As an alternative to its motion to dismiss based on an alleged lack of personal jurisdiction, the Morris Defendants request that the Court transfer this action to the Middle District of Florida. Because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district venue in this Court is proper. Also, the Morris Defendants have not established sufficient cause to override the strong presumption in favor of the Plaintiffs' choice of venue where they reside. Therefore, the Court declines to exercise its discretion to transfer this action.

First, the Morris Defendants – but not any of the other defendants – challenge the venue of this action pursuant to Rule 12(b)(3) and 28 U.S.C. § 1391(b). Under section 1391(b), venue is proper, among other grounds, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated." 28 U.S.C. § 1391(b). As discussed above in connection with the issue of personal jurisdiction, the Court finds that most, if not all, of the communications and transmissions of documents related to the core dispute over the 2016 Financial Plan and the purchase of the Omega IUL Policy occurred in or involved North Carolina, which was the Plaintiffs' place of residence from mid-2014 to the present. Thus, at least a "substantial part" of the events giving rise to the Plaintiffs' claims occurred in this judicial district so venue is proper here under 28 U.S.C. § 1391(b).

Beyond their claims that venue is improper, the Morris Defendants have not specifically moved the Court to transfer venue pursuant to Section 1404(a) of Title 28 of the United States Code, which gives the Court discretion to transfer venue to any other district or division where it might have been brought "[f]or the convenience of the parties and witnesses, in the interest of

justice…". 28 U.S.C. § 1404(a). However, because the Morris Defendants have, at least in part, argued the application of a number of the factors that the Court considers under Section 1404(a) motions, the Court will address why it will not exercise its discretion to transfer this case.

There are numerous factors that the Court should consider in determining if an action should be transferred:

> [1] the plaintiff's initial choice of forum; [2] the residence of the parties; [3] the relative ease of access of proof; [4] the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses; [5] the possibility of a view; [6] the enforceability of a judgment, if obtained; [7] the relative advantages and obstacles to a fair trial; [8] other practical problems that make a trial easy, expeditious, and inexpensive; [9] the administrative difficulties of court congestion; [10] the interest in having localized controversies settled at home [and] the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action; [11] and the avoidance of unnecessary problems with conflict of laws.

*Commercial Equip. Co.*, 738 F. Supp. at 976.

Plaintiffs chose North Carolina as its choice of forum, and courts give great weight to this factor of the analysis. *See Collins v. Straight, Inc*., 748 F.2d 916, 921 (4th Cir. 1984); *Carefirst*, 305 F.3d at 260 (plaintiff's choice of forum generally is "entitled to respect and deference,"); *Commercial Equip. Co*., 738 F. Supp. at 976 ("[A] court ordinarily should accord the plaintiff's choice of forum great weight."). This choice receives less weight, however, if (1) the plaintiff chooses a foreign forum, or (2) the cause of action bears little or no relation to the chosen forum. *Collins*, 748 F.2d at 921. Neither of these exceptions applies to this action. First, this judicial district is the Plaintiffs' home district, not a foreign forum. Also, as already discussed, the causes of action asserted by the Plaintiffs bear a substantial relation to the chosen forum. Accordingly, Plaintiffs' choice of forum must be given great weight in considering a transfer of venue.

The Morris Defendants argue that factors 3, 4, 6 and 7 listed above "all weigh heavily in favor of transferring the case" to Florida. Doc. No. 27 at 13. The Court disagrees. Factor no. 3,

"the relative ease of access of proof," is at most neutral because Plaintiffs' evidence will primarily be found in North Carolina and the Defendants' evidence in Florida, to the extent that the evidence is not documentation that is easily produced in either forum. Factor no. 4, "the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses," at most tips slightly in favor of Florida because, again, Plaintiffs are located in North Carolina and some of the Defendants and potential non-party witnesses live in Florida. Factor no. 6, "the enforceability of a judgment, if obtained," mostly favors Florida, the residence of two of the three groups of defendants, but, standing alone, is far from sufficient to support transfer. Finally, factor no. 7, the relative advantages and obstacles to a fair trial, is neutral, with the Morris Defendants offering no grounds for a finding that they cannot obtain a fair trial in this district. The remaining factors either favor trial in North Carolina (e.g., factor 10), are neutral or are not applicable or relevant to this action.

In summary, transferring this case would improperly merely shift the inconvenience of the action from one party to another, which does not satisfy Defendants' burden. *Commercial Equip. Co.,* 738 F. Supp. at 976; *DMP Corp. v. Fruehauf Corp.*, 617 F. Supp. 76, 77 (W.D.N.C.1985) (movant must show that transfer does more than merely "shift the inconvenience to the other party"). Thus, giving due deference to Plaintiffs' choice of forum and finding no compelling grounds to transfer the action in the interests of justice, the Court will decline to transfer this action to the Middle District of Florida.

### C.    Arbitration

The third and final jurisdictional / venue issue presented by the Morris Defendants is their Motion to Stay and Compel Arbitration in which they argue that pursuant to the FAA, 9 U.S.C. §§1, *et seq.*, Plaintiffs' claims against them must be referred to arbitration. Although the Court

readily acknowledges the federal policy favoring arbitration if the parties enter an agreement to arbitrate their disputes, there is also a clear countervailing rule that a "party cannot be required to submit to arbitration any dispute which he has not agreed to so submit." *Levin v. Alms & Assocs., Inc.,* 634 F.3d at 266. Because the Court finds, based on undisputed facts, that the parties did not ever finalize the AMA under North Carolina law, there is no existing "valid agreement to arbitrate" so the motion to compel arbitration will be denied.[2]

As noted in a thorough and thoughtful recent decision in the District of South Carolina, *Berkeley County School District v. HUB International Limited*, 363 F. Supp. 3d 632, 639 (D.S.C. 2019), "the law on arbitration has become rather complex." Under the FAA, arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. However, the issue of whether an arbitration clause is valid under § 2 of the FAA is a different issue from whether the parties ever formed an agreement to arbitrate. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006) ("The issue of the contract's validity is different from the issue whether any agreement between the alleged obligor and obligee was ever concluded"). Indeed, the Supreme Court has

---

[2] Having determined that the parties did not enter into a valid agreement to arbitrate, the Court does not reach other significant issues related to a potential arbitration of this dispute, including, but not limited to, whether the arbitrability of the dispute is a matter for the Court or an arbitrator to decide. While the reference in the putative arbitration clause to the AAA rules would provide the "clear and unmistakable" evidence of the parties' intent to refer arbitrability issues to an arbitrator if the AMA was an agreement between "sophisticated" parties, *see Simply Wireless, Inc. v. T-Mobile US, Inc*., 877 F.3d. 522, 527-29 (4th Cir. 2017), that holding may well not apply to this case in which the Plaintiffs work in construction management and nursing and would have little knowledge of the AAA rules. Nor would Plaintiffs likely have any intuitive understanding that an arbitrator, who has an obvious personal financial interest in serving as the arbitrator, has the authority under the AAA rules to decide whether or not the parties' dispute is subject to arbitration. Also, there would be substantial questions whether the parties' dispute is subject to arbitration (including the timing and nature of the dispute as noted by the Plaintiffs) if it is up to the Court to determine the arbitrability of the dispute.

explained that the validity of an arbitration clause, which is governed by § 2, addresses "whether it is legally binding, as opposed to whether it was in fact agreed to." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010); *see also Nat'l Fed'n of the Blind v. The Container Store, Inc*., 904 F.3d 70, 80 (1st Cir. 2018) ("Pursuant to established Supreme Court precedent, however, there's an important distinction between arguments challenging the validity of an agreement and those challenging an agreement's formation." (citations omitted)).

Section 4 of Title 9 authorizes a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition [a] United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement." See 9 U.S.C. § 4. Section 4 provides that, when presented with such a petition (or motion), a court

> shall hear the parties, and upon being satisfied that the making of the agreement for arbitration ... is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

*Id*. Section 4 further provides that if the "making of the arbitration agreement ... be in issue," then "the court shall proceed summarily to the trial thereof." Id. (the "Trial Provision").

Therefore, Section 4 requires that "the district court — rather than an arbitrator — decide whether the parties have formed an agreement to arbitrate." *Berkeley County*, 944 F.3d at 234, *citing*, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (explaining that dispute over formation of agreement to arbitrate "is generally for court[ ] to decide"); *see also*, *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 637 (4th Cir. 2002) (agreeing with other courts of appeals that party's assent to arbitration provision is a question for court). Further, in making such a decision, the court may be obliged to conduct a trial under the Trial Provision when

there is are disputed issues of fact concerning whether an arbitration agreement exists. *See Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015).

To decide whether "sufficient facts" support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test. *See Chorley Enters., Inc.*, 807 F.3d at 564; *see also* Fed. R. Civ. P. 56(a). In applying that standard, the court is entitled to consider materials other than the complaint and its supporting documents. *See Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 86 (4th Cir. 2016) (evaluating materials outside of complaint in assessing motion to compel arbitration). If the record reveals a genuine dispute of material fact "regarding the existence of an agreement to arbitrate," *see Chorley Enters., Inc.*, 807 F.3d at 564, the "court shall proceed summarily" and conduct a trial on the motion to compel arbitration, *see* 9 U.S.C. § 4. A factual dispute is material if the resolution thereof "might affect the outcome of the [motion] under the governing law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When deciding issues of contract formation courts generally apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). This stems from the basic principle that arbitration is a matter of contract law and arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648–49 (1986). "[A] court may order arbitration only when it 'is satisfied that the parties agreed to arbitrate.'" *Lorenzo v. Prime Commc'ns*, L.P., 806 F.3d 777, 781 (4th Cir. 2015) (*quoting Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)). Here, the AMA provides that "[t]his Agreement will be construed under the laws of the state of Client's primary residence." Doc. No. 24-1 at 10, ¶ 23. It is undisputed that Mr. Rowland lived in North

Carolina in October 2017, when the AMA was allegedly executed. Therefore, North Carolina law governs the issue of whether the AMA was validly formed.

Under North Carolina law, a valid contract between two parties can only exist when the parties "assent to the same thing in the same sense, and their minds meet as to all terms." *Normile v. Miller*, 313 N.C. 98 (1985), *quoting, Goeckel v. Stokely*, 236 N.C. 604, 607 (1952). This assent, or meeting of the minds, requires an offer and acceptance in the exact terms and that the acceptance must be communicated to the offeror. *Id*. If the terms of the offer are changed or any new ones added by the acceptance, there is no meeting of the minds and, consequently, no contract. *Id*. Indeed, the counteroffer amounts to a rejection of the original offer. *Id*. The offeree, by failing to unconditionally assent to the terms of the original offer and instead qualifying his acceptance with terms of his own, in effect makes a counteroffer on the new terms and no contract is formed unless the original offeror accepts the proposed contract with the new terms. *Id*.; *see also Raynor v. G4S Secure Solutions (USA) Inc.*, 327 F.Supp.3d 925, 939 (W.D.N.C. 2018) (A valid contract "requires an offer and acceptance in the exact terms and that the acceptance must be communicated to the offeror").

Regarding the formation of the AMA, the parties have submitted two versions of the document to the Court along with affidavits from Mr. Rowland and Ms. Morris that describe the execution of both documents. Doc. Nos. 24-1, 36, 36-6 and 43. The first version of the AMA (the "Rowland AMA") was signed by Mr. Rowland through a "Docusign" process and then electronically sent to Morris / SMF. On the final page of the Rowland AMA (page 15), Mr. Rowland partially completed a "risk profile," but did not indicate any choice for the critical questions of "Risk Tolerance" or "Investment Objective," among other information. Doc. No. 36-6 at 50. When Morris / SMF received the Rowland AMA, it was not executed in the same form.

*See* Doc. No. 24-1 (the "Morris AMA"). Instead, Morris admits that what she characterizes as "minor changes" were made to the Rowland AMA "after Mr. Rowland signed the AMA." Doc. 43 at 2, ¶ 7. Further, Morris specifically admits that the "additional information" that was put into the risk profile was put there "by someone at SMF." *Id.* at 4-5, ¶14. SMF and Morris executed this modified AMA, but Mr. Rowland has testified without contradiction that the Morris AMA was never sent to him and he never signed it. Doc. 36 at 5, ¶ 30.

The Morris Defendants argue that their modifications were "minor" and, in any event, reflected information contained in other documents from Mr. Rowland. First, the self-serving characterization of the changes as "minor" is not relevant (nor accurate). There is no dispute that places for the client's indication of "risk tolerance" and "investment objective" were included in the AMA and were expressly material to the AMA. *See* Doc. 24-1 at 1 ("The Account will be managed by Sandy Morris Financial, in accordance with the instructions listed below, on the basis of the Client's financial situation, *investment objectives and risk tolerance*.") (emphasis added). Further, the argument that the information is consistent with earlier documents prepared by Mr. Rowland is similarly unpersuasive. Whether or not Mr. Rowland might have signed the modified AMA[3] is not at issue; rather, the issue as it relates to the formation of a contract is whether he in fact signed the different Morris AMA.

In short, taken together, these documents and affidavits establish that the AMA was never executed by *both* parties on the *same* terms. Therefore, no valid contract was ever formed under the long established black letter North Carolina law discussed above. In the absence of the

---

[3] Also, although the merits of this contention are irrelevant, they are decidedly uncertain. The document that the Morris Defendants reference as support for their argument was prepared in July 2015, well over two years before the execution of AMAs. Plainly, the Plaintiffs' "investment objectives" and "risk tolerance" might have changed in the intervening years, particularly as a result of their more recent 2016 Financial Plan.

formation of a valid AMA, there is no valid agreement to arbitrate between the parties. Accordingly, the Morris Defendants are not entitled to compel arbitration of the Plaintiffs' claims.

### D. Failure to State a Claim under Rule 12(b)(6)

#### 1. Claims against Global Financial Private Capital

GFPC moves to dismiss all the claims against it pursuant to Rule 12(b)(6), arguing that the Complaint fails to allege facts connecting GFPC to the Plaintiffs' alleged damages sufficient to state a plausible claim against it. Doc. 20 at 1-2. Plaintiffs respond that they have adequately pled that Ms. Morris was acting as an authorized "Global Financial" advisor and agent of GFPC such that GFPC is also liable for Morris' allegedly improper and damaging financial advice and the sale of the Omega IUL Policy. *See, e.g.*, Complaint, Doc. 1, at ¶¶ 22-24, 116, 118, 120-22. This motion is governed by the lenient (but not unbounded) standard for review of a motion to dismiss for failure to state a claim, which requires that the Court accept the Plaintiffs' well-pleaded factual allegations as true, construe all reasonable inferences in their favor and dismiss the claims only if the allegations cannot plausibly support Plaintiffs' claims. Applying these generous standards, the Court finds that Plaintiffs' claims against GFPC have, at this early stage of the case, been sufficiently and plausibly pled based, among other allegations, on the alleged agency and representative relationships between Morris and GFPC and the related alleged breaches of fiduciary, statutory and contractual duties. Therefore, GFPC's motion to dismiss will be denied, without prejudice to its right to appropriately raise its arguments again at summary judgment, where the standard of review will be more exacting.

#### 2. Claims on behalf of Donna Rowland

Finally, all the moving defendants seek dismissal of the claims of Donna Rowland pursuant to Rule 12(b)(6). They allege that there is no basis for Ms. Rowland's claims because she is not

an owner of the Omega IUL Policy, did not use her own funds to pay for the Policy, allegedly did not rely on the asserted misrepresentations, was not a contractual counterparty with any of the Defendants and did not suffer damages in connection with the solicitation or sale of the Policy. In response, Plaintiffs point to the following allegations of the Complaint to establish Ms. Rowland's connection to her claims:

> The Complaint alleges that "the Rowlands . . . retained the financial advisory services of Morris, Morris FES, and Global Financial," [Compl. ¶ 24), and that Morris was "the Rowlands' financial advisor," [*id.* ¶ 52]. Further, the Complaint alleges that both of "the Rowlands were paying a separate fee for the purported advisory and wealth management services rendered by Morris, Morris-FES, and Global Financial." [*Id.* ¶ 55]. The Complaint asserts that both Mr. and Mrs. Rowland held numerous meetings with Morris, [*id.* ¶¶ 35, 37, 74, 82], and that Morris provided advice to both Mr. and Mrs. Rowland, [*id.* ¶¶ 33, 34, 78, 83, 91, 92]. Based on these factual allegations and others, the Complaint repeatedly alleges that Morris was "their [*i.e.* Mr. *and Mrs. Rowland's*] trusted investment advisor and fiduciary." [*Id.* ¶ 1].
>
> …
>
> The Complaint also alleges that "Morris convinced the Rowlands, through material nondisclosures and misleading statements, to pursue" the Omega IUL Policy at issue in this action, which was part of a retirement "redesign" plan that took into account both Mr. and Mrs. Rolwands' collective future income streams and expenses. [*Id.* ¶¶ 3, 30]. Morris advised *both* Plaintiffs, in the written plan, that Mr. and Mrs. Rowland would have a *collective* income gap of $41,000 per year in the future. [*Id.* ¶¶ 31-32]. In mid-February 2016, Mrs. Rowland discussed this February 2016 written "redesign" plan with Morris during a Skype videoconference in which she participated. [*Id.* ¶ 35].
>
> …
>
> In addition to express allegations that Mrs. Rowland relied on Morris' representations, Mrs. Rowland's participation in the Skype conference supports the reasonable and plausible inference that Mrs. Rowland was a *joint* decision-maker in the couple's decision to follow the retirement "redesign" that Morris recommended, which included Mr. Rowland's sale of certain securities and purchase of the Omega IUP Policy. [*Id.* ¶¶ 34-35, 37].
>
> …
>
> As a result of Morris's self-interested advice, the Complaint alleges that Mrs. Rowland has incurred substantial joint tax liability, has a tax lien on her primary residence, and has lost the benefit of investing in and earning interest on suitable investments. [*Id.* ¶¶ 93-94].

Doc. No. 35 at 20-21 (emphasis in original).

Again, at this initial stage of the case, Plaintiffs' claims must be accepted as true with all reasonable inferences construed in the light most favorable to their claims. Accordingly, as with the claims against GFPC, the Court finds that Ms. Rowland's claims have been adequately and plausibly pled so Defendants' motion to dismiss will be denied, subject to possible renewal at summary judgment.

## IV.     ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Motions to Dismiss, Stay and Compel Arbitration (Doc. Nos. 20, 23, 25 and 26) are **DENIED;**

2. This case shall **move forward to discovery and further proceedings on the merits of Plaintiffs' claims** in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed:     February 3, 2020

Kenneth D. Bell
United States District Judge